UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

Plaintiff,

v.

CHRISTOPHER GREINER and COMPUTER
SCIENCES CORPORATION,

Defendants.

No. 13 Civ. _____

**COMPLAINT**

Jury Trial Demanded

**13 CV    0316**

Plaintiff International Business Machines Corporation ("IBM" or the

"Company"), by its attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, upon

personal knowledge with respect to itself and its actions and otherwise on information

and belief, alleges as follows:

**Nature of the Action**

1.      This is an action by IBM to enforce its legal rights to stop a former

IBM executive from poaching IBM's employees on behalf of and in concert with his new

employer, an IBM competitor, in violation of an agreement prohibiting him from

participating, directly or indirectly, in the solicitation or hiring of any IBM employees for

two years after his departure from IBM.  IBM seeks injunctive relief and damages against

all defendants.

2.      Christopher Greiner, the former IBM executive, has aided his new

employer, Computer Sciences Corporation ("CSC"), in a raid on IBM's finance

department, leading to the announcement last week by five IBM employees of their

resignations and intentions to join CSC.  Mr. Greiner's conduct is continuing.  IBM

knows of at least one additional IBM employee who recently received an offer from CSC following conversations with Mr. Greiner.

3.    Mr. Greiner has acted not as a rogue headhunter, but with the knowledge and approval of CSC and its senior management.  It is public knowledge that CSC's financial reporting is under regulatory scrutiny, indicating a need for CSC to improve its finance department.  What was not known until last week, however, is that Mr. Greiner—who began working at CSC in November 2012—has been operating as a CSC recruiter to bring numerous IBM finance employees to join him at CSC.  This raid of IBM employees was encouraged and authorized by CSC's Chief Financial Officer, Paul N. Saleh, who had personally targeted IBM before hiring Mr. Greiner at CSC, and who used Mr. Greiner to succeed in the recruitment of IBM personnel at which Mr. Saleh had failed.

4.    Remarkably, as IBM has just learned, Mr. Greiner started CSC's deliberate and systematic raid months ago in October 2012, while Mr. Greiner was still working for IBM.  And after Mr. Greiner left IBM and received an explicit written reminder to abide by his non-solicitation agreement—well before IBM learned of Mr. Greiner's serial breaches—his efforts and those of CSC to hire away some of IBM's best talent continued, and they will continue unless the Court enjoins him from violating his contractual obligations to IBM and enjoins CSC from inducing him to do so.

5.    Indeed, IBM notified CSC last week that it intended to take legal action against CSC and Mr. Greiner, and, to IBM's knowledge, neither has taken any action to stop this misconduct or compensate IBM for the substantial damages it already has inflicted.

### Parties

6.     Plaintiff IBM is a New York corporation with its principal place of business in Armonk, New York, which is in Westchester County.  IBM is one of the world's largest business and information technology services companies, offering a wide range of information technology products and services.

7.     Defendant CSC is a Nevada corporation with its principal place of business in Falls Church, Virginia.  CSC is also an information technology and professional services company and is a direct competitor to IBM.  IBM and CSC are major competitors in the general areas of their businesses, which include Information Technology Services, IT Solutions, and Business Analytics.  In these key business areas, IBM and CSC often compete for the same highly profitable accounts from the same client base of commercial and government entities.

8.     Defendant Christopher Greiner is a former IBM executive who left IBM in November 2012 and now works at CSC.  On information and belief, he resides at 57 Sail Harbour Drive, New Fairfield, Connecticut 06812.

### Jurisdiction and Venue

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

10.     The Court has personal jurisdiction over Mr. Greiner because he consented to jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the agreement with IBM that he breached and that is the subject of this action.

3

11.     The Court has personal jurisdiction over CSC under CPLR § 301, New York's long-arm statute, because of its continuous and systematic business contacts with the State of New York.  The Court also has personal jurisdiction over CSC under CPLR § 302(a)(3), because CSC committed tortious acts causing injury to IBM within New York, that injury gives rise to this action, and CSC does business in the state and derives substantial revenue from goods and services used, consumed, and rendered in the state.

12.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because IBM's headquarters and principal place of business are situated within this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.  In addition, Mr. Greiner consented to venue in this district, as stated above.

### Relevant Facts

**Background to the Raid: CSC Sets Its
Sights on IBM's Finance Department**

13.     According to CSC's latest annual report, CSC's Audit Committee and the SEC have been investigating, since at least February 2010, certain substantial accounting errors and irregularities at the company.

14.     Before joining CSC as CFO, Paul N. Saleh was Senior Vice President and Chief Financial Officer for Gannett Co., Inc., the newspaper publishing company.  In early May 2012, while Mr. Saleh was still at Gannett, IBM finance executives, including Mr. Greiner (then IBM's Director, CFO Business Analytics IBM Software Group), and Carlos Passi (IBM's Assistant Controller, Business Transformation), made a presentation to Mr. Saleh concerning IBM's experience in

finance transformation, including the processes, tools and capabilities required to support such transformation.

15. A week later, Mr. Saleh was appointed Vice President and CFO of CSC and was charged with trying to clean up the financial reporting problems plaguing the company. Almost immediately, Mr. Saleh began recruiting Mr. Passi to leave IBM to work for CSC. Mr. Saleh told Mr. Passi that, if he joined CSC, he could staff his own team.

16. Mr. Passi later declined Mr. Saleh's offer and remained at IBM.

17. Mr. Saleh was more successful in recruiting Mr. Greiner, however, and apparently gave Mr. Greiner the same green light to recruit others at IBM.

**CSC Recruits Mr. Greiner**

18. In 2012, Mr. Greiner was Chief Financial Officer of Business Analytics at IBM. IBM's Business Analytics division offers clients a broad, integrated portfolio of analytics, software capabilities and complementary services. As CFO of the Business Analytics division, Mr. Greiner had wide-ranging operational responsibility that included implementing strategies in the division that would drive top line growth and managing analytical maturity by identifying and responding to challenges in performance.

19. Prior to June 2012, Mr. Greiner had worked for over a dozen years as a finance executive in various positions at IBM.

20. In early October 2012, Mr. Greiner notified IBM that CSC had offered him a position and that he was contemplating accepting it.

21. In response, IBM offered Mr. Greiner a promotion and a pay increase to stay at IBM instead of leaving for CSC. IBM's package included a promotion

to Vice President of IBM's Performance Management segment.  In that new position, Mr. Greiner would be responsible for leading one of IBM's growth initiatives and for deploying IBM's analytics portfolio across the enterprise.  Mr. Greiner accepted IBM's offer on October 14, 2012.

22.     IBM announced Mr. Greiner's new position to other IBM employees in a conference call on October 18, 2012 and by email on October 19, 2012. IBM then introduced Mr. Greiner, in his brand new position, to a gathering of clients and media at IBM's annual Information on Demand conference in Las Vegas, which was held on October 21-25, 2012.  Information on Demand is a major IBM-sponsored customer event that showcases IBM's technology and provides customer training.  The conference was attended by approximately 12,000 customers, business partners, members of the press, industry analysts, and IBM employees.

23.     No sooner had IBM promoted Mr. Greiner and publicly announced the promotion, than Mr. Greiner turned around and left IBM to join CSC.

24.     Mr. Greiner's last day at IBM was November 6, 2012.  In an earnings conference call that took place on that same day, CSC announced that Mr. Greiner would be joining CSC as Vice President of Finance for CSC's Global Industries.

25.     When Mr. Greiner left, he still had multiple obligations to IBM.  In particular, Mr. Greiner had obligations under a non-solicitation/non-hire agreement he had accepted when he received an equity award from IBM.  IBM granted Mr. Greiner restricted stock units ("RSUs") under the company's 1999 Long Term Performance Plan ("LTPP" or the "1999 Plan").

26.     IBM grants such RSUs to its senior executives in exchange for

6

their agreement to certain terms and conditions.  One condition is that the employee must

agree not to directly or indirectly solicit or hire any other IBM employee to be employed

outside the Company.  Thus the Terms and Conditions to Mr. Greiner's RSUs provide:

> In consideration of your Award, you agree that during your employment
> with the Company and for two years following the termination of your
> employment for any reason, you will not directly or indirectly hire, solicit
> or make an offer to any employee of the Company to be employed or
> perform services outside of the Company.

(Terms & Conditions, p. 5)

> 27.    The Terms and Conditions also provide:

> By accepting your Award, you acknowledge that the Company would
> suffer irreparable harm if you fail to comply with the foregoing, and that
> the Company would be entitled to any appropriate relief, including money
> damages, equitable relief and attorneys' fees.

(*Id.*)

> 28.    Mr. Greiner agreed to those Terms and Conditions in exchange for

his RSUs in June 2012.

> 29.    CSC's public filings show that CEO J. Michael Lawrie has

received RSUs from CSC, and his RSU agreement with CSC has a rigorous non-

solicitation and non-hiring provision as well.  Moreover, Mr. Lawrie, who worked at

IBM until 2004, received equity awards from IBM subject to a non-solicitation provision

that is nearly identical to the one Mr. Greiner agreed to under the LTPP.  These

agreements are common in the industry, and executives at levels like Messrs. Greiner,

Saleh and Lawrie are familiar with their terms and conditions.

> 30.    On December 16, 2012, IBM wrote Mr. Greiner to remind him of

his ongoing obligations to IBM, including his non-solicitation/non-hire agreement.

Sending such a reminder letter to a former IBM employee subject to post-employment

restrictions is standard operating procedure at IBM.

**Mr. Greiner's Campaign to Raid**
**IBM's Finance Staff on Behalf of CSC**

31.   Without the knowledge of his IBM superiors at the time, Mr. Greiner started the campaign to recruit other IBM finance employees to work for CSC even while Mr. Greiner was still working at IBM.

32.   At 11:40am on October 24, 2012, during the Information on Demand Conference in Las Vegas where IBM announced Mr. Greiner's promotion, Mr. Greiner made a blatant solicitation on CSC's behalf to Eric Larson, an employee in IBM Finance.  Mr. Greiner was an IBM employee, attending an IBM conference, and using an IBM messaging system.  The solicitation of Mr. Larson began by "Sametime," an instant messaging system used within IBM.  It went like this:

Greiner:  yo

Larson:  yo

Greiner:  send me your resume to my personal email address chrisgreiner1@gmail.com ok?

Larson:  sure  i don't have it on this pc  can I get it to you tonight?

Greiner:  yes but need tonight  k?

Larson:  mind if i ask why?

Greiner:  keeping an eye out for u for an oppty   would be outside ibm  but I know someone looking

Larson:  ok thanks appreciate it

Greiner:  much more $  bigger job  chance to change your career trajectory

Larson:  just so u known im on retention right now  but ok

Greiner:  how much?

Larson:  25

Greiner:  no worries  they'd cover that  u mobile?

Larson:  can i call your cell tonight?

Greiner:  yes  203 731 4690

Larson:  ok  will call u tonight

33.     Mere minutes after this exchange, Mr. Greiner emailed two other IBM employees at 11:55am and 11:57am, respectively, asking them to "send me your personal email address . . . send to chrisgreiner1@gmail.com."

34.     And Mr. Greiner's campaign to recruit IBM employees to work for CSC in violation of his non-solicitation/non-hire agreement was only just beginning. Indeed, his efforts to recruit IBM employees have continued after his departure from IBM and to this very day, in violation of his written agreement with IBM.

35.     Immediately upon joining CSC's finance department, Mr. Greiner set out to stock CSC's finance team with IBM talent.  According to statements that Mr. Greiner made to IBM employees, Mr. Greiner's conduct is occurring with the knowledge and encouragement of Mr. Saleh, CSC's CFO.

36.     On November 30, 2012, another IBM executive close to Mr. Greiner, Stacy Pschenica, left IBM for CSC's marketing department.

37.     Dan Perkins, a finance employee in the Global Business Services department, was contacted by Mr. Greiner in mid-December via a LinkedIn message. Mr. Greiner told Mr. Perkins about career opportunities at CSC, and the two subsequently spoke about the terms of a potential offer of employment for Mr. Perkins by CSC.  After hearing about the proposed compensation package, Mr. Perkins asked Mr. Greiner if Mr. Perkins would have to spend a day interviewing at CSC's offices before receiving a formal offer.  Mr. Greiner assured Mr. Perkins that interviews would not be necessary,

and that the job was his if he wanted it. Mr. Perkins had an ongoing discussion with Mr.

Greiner until Mr. Perkins decided to reject the offer this week.

38.     Mr. Greiner's campaign first came to light at IBM on Monday,

January 7, 2013, when three IBM employees in Finance—Nathan Taylor, Dustin

Semach, and Eric Markovich—notified IBM that they were leaving IBM to work at CSC.

Two of them had worked closely with Mr. Greiner before he left IBM.

39.     Putting two and two together, Neal Marx, Vice President Finance

of IBM's Software Solutions Group, called Mr. Greiner that evening. Mr. Marx told Mr.

Greiner that his solicitation of IBM employees was inappropriate and in violation of his

non-solicitation/no-hire agreement with IBM. Mr. Greiner responded that multiple IBM

employees had contacted him concerning employment opportunities at CSC. Mr. Greiner

suggested that he had personal involvement in the hiring of at least the three IBM

employees who had announced their resignations on Monday, January 7, and that there

would be more. Mr. Greiner—who told Mr. Taylor that he anticipated that IBM's

reaction to CSC's hiring of the IBM employees "will be hell" for Mr. Greiner—admitted

to Mr. Marx that he had anticipated IBM's response with respect to his hiring activities.

He said that he had reviewed his activities with respect to CSC's hiring of IBM

employees with his manager, Paul Saleh.

40.     The next day, Mr. Marx spoke with Abedin Bujupaj, who was Mr.

Semach's supervisor, to discuss what Mr. Bujupaj should say to Mr. Semach in Mr.

Semach's departure interview. Mr. Bujupaj interrupted Mr. Marx to tell him that he, too,

was leaving IBM to work for CSC.

41.     The next shoe dropped on January 10, 2013 when Greg Loeffert, an employee in Investor Relations, notified IBM that he, too, was resigning to go to CSC.

42.     Messrs. Markovich, Semach, Taylor, and Loeffert have all confirmed Mr. Greiner's involvement in their recruitment and hiring by CSC.

43.     Three of them had discussions with Mr. Greiner about CSC, and CSC made them employment offers without meeting them or interviewing them. Another was interviewed by Mr. Greiner at CSC's offices in Falls Church as part of his hiring process. Mr. Greiner also hosted a "meet-and-greet" for several of the IBM employees at his home in New Fairfield, Connecticut on December 30, 2012, during which the employees discussed when they would notify IBM that they were leaving to work at CSC.

44.     Mr. Greiner has continued to contact current IBM employees to solicit their services for CSC. IBM is aware of active solicitation by CSC to poach IBM's talented finance executives. One such executive, who turned down a previous offer of employment by CSC in the fall, was contacted again by CSC as recently as last week.

45.     The following is a brief summary of Mr. Greiner's actions in connection with the solicitation and hiring of four IBM employees on behalf of CSC:

### *Eric Markovich*

46.     Prior to his resignation on January 7, 2013, Eric Markovich was a Software Revenue Analyst and Forecast Coordinator at IBM. Before working in that position, he had worked with Mr. Greiner in the finance area for IBM's Business Analytics group.

47.     When Mr. Greiner left IBM to work for CSC in November 2012, Mr. Markovich asked Mr. Greiner to let him know if there were any opportunities for him to join Mr. Greiner at CSC.

48.     Days later, Mr. Greiner called Mr. Markovich and initiated discussions about Mr. Markovich coming to work at CSC.

49.     They spoke about once a week until mid-December, when Mr. Greiner told Mr. Markovich that CSC's Human Resources Department would be contacting him about a job offer.

50.     Mr. Markovich then received the call from CSC and was asked to fill out an online application.  A week later, CSC offered Mr. Markovich a job, without even meeting or interviewing him.  Mr. Markovich said he believed that his work with Mr. Greiner at IBM had been like a six-month interview, so there was no need for anyone else at CSC to interview or meet with him.

51.     When Mr. Greiner was Mr. Markovich's supervisor at IBM, he had arranged for Mr. Markovich to be given a retention bonus as an assurance that Mr. Markovich would stay at IBM.  Mr. Markovich said that Mr. Greiner has assured him that CSC will "make him whole" for the bonus that he is forfeiting by leaving IBM.

52.     Mr. Markovich notified IBM on January 7, 2013 that he was resigning.  He intends to start working at CSC on January 21, 2013.

### *Dustin Semach*

53.     Prior to his resignation on January 7, 2012, Dustin Semach was a Professional Financial Analyst in IBM's Software Group, Business Analytics division.

54.     Mr. Semach emailed Mr. Greiner in November 2012 to ask him

about job possibilities at CSC. Mr. Greiner replied that there was a potential opportunity and asked Mr. Semach to send him his resume.

   55. Mr. Greiner then forwarded Mr. Semach's resume to CSC's Human Resources Department, told Mr. Semach what the application process at CSC would involve, and "coached" him as to what to expect from the process.

   56. Mr. Semach had a call with several members of CSC's Human Resources Department, but, like Mr. Markovich, did not visit CSC's offices for a job interview. CSC offered him a position on December 20, 2012.

   57. The week after Christmas, Mr. Greiner called Mr. Semach to congratulate him on his new position. Mr. Greiner invited Mr. Semach to a "meet-and-greet" at Mr. Greiner's house in New Fairfield, Connecticut on December 30, 2012. Mr. Semach was out of town and was unable to attend.

   58. Mr. Semach tendered his resignation to IBM on January 7, 2012.

### *Nathan Taylor*

   59. Nathan Taylor held the position of Controller/Consolidation Manager, IBM Security Software prior to his resignation from IBM on January 7, 2013.

   60. When Mr. Greiner left IBM, Mr. Taylor asked him to stay in touch and told him that, "if anything comes up, let me know."

   61. Days later, Mr. Greiner called Mr. Taylor and told him he "might have something for" Mr. Taylor if he were interested. Mr. Taylor said he was.

   62. Later in November 2012 Mr. Greiner called again. He told Mr. Taylor that he "had some openings that could be great." A week later, Mr. Greiner called Mr. Taylor again to discuss the positions.

63.    Mr. Taylor then went to CSC's headquarters in Falls Church for interviews on December 13, 2012.  Among others, he had interviews with Mr. Greiner, Mr. Saleh, and Jim Cook, CSC's Executive Vice President & General Manager of Global Industries.  During his interview, Mr. Taylor and Mr. Greiner discussed his prospective responsibilities and compensation.

64.    Mr. Taylor then had a phone interview with his prospective supervisor and received an offer letter from CSC the next day.

65.    Mr. Taylor and two other IBM employees who were being hired by CSC attended the "meet-and-greet" at Mr. Greiner's house on December 30, 2012.  Mr. Taylor told the other IBM employees that he planned to notify IBM of his resignation on January 7, 2013, which he did.

66.    At one point, Mr. Greiner told Mr. Taylor that he anticipated that the reaction to news of CSC's hiring Mr. Taylor and other former IBM employees "will be hell" for Mr. Greiner.

### *Greg Loeffert*

67.    Greg Loeffert was an Investor Relation Manager in IBM's Investor Relations Department before he resigned from IBM on January 10, 2013.  Prior to that, Mr. Loeffert had been the Finance and Operations Controller in IBM's Business Analytics Division, working in Mr. Greiner's organization.

68.    Mr. Loeffert worked with Mr. Greiner before Mr. Greiner left IBM to work at CSC.

69.    Mr. Loeffert called Mr. Greiner after Mr. Greiner started working at CSC.  Mr. Greiner told him that CSC was in the midst of a large reorganization and

that there might be interesting positions for Mr. Loeffert. He advised Mr. Loeffert to look at CSC's website to see whether he could find a job he liked.

70.    Mr. Loeffert followed Mr. Greiner's instructions. He visited CSC's website and applied for a position at CSC at the beginning of December 2012. After applying for the job at CSC, Mr. Loeffert and Mr. Greiner spoke again. Although Mr. Loeffert did not tell Mr. Greiner that he applied for a position at CSC, it was clear to Mr. Loeffert that Mr. Greiner already knew. During at least one of their phone calls, Mr. Greiner suggested that he could help guide Mr. Loeffert to the proper role at CSC.

71.    CSC's Human Resources Department contacted Mr. Loeffert in mid-December and asked him fill out in some additional forms. After this, and without having to visit CSC's offices for an interview or to meet with anyone, CSC offered Mr. Loeffert a job.

72.    Thereafter, Mr. Greiner and Mr. Loeffert had at least one other phone call in which they discussed CSC's offer to Mr. Loeffert and what his responsibilities would be. Mr. Greiner confirmed that Mr. Loeffert would be working under him at CSC.

73.    Mr. Loeffert also recently met socially with Mr. Greiner and other IBM employees who were about to leave IBM to join CSC.

74.    Mr. Loeffert notified IBM on January 10, 2013, that he was leaving IBM to work for CSC.

**Mr. Greiner and CSC Disregard IBM's Warning Letter**

75.    On January 10, 2013, IBM wrote to CSC, Mr. Saleh, and Mr. Greiner notifying them that IBM intended to take legal action to stop Mr. Greiner from violating his non-solicitation/non-hire agreement and to stop CSC from inducing him to

breach that agreement.

76.     Although counsel for CSC contacted IBM's counsel yesterday, neither CSC nor Mr. Greiner has taken any action to stop this misconduct or compensate IBM for the damages it has inflicted.

**The Injury to IBM**

77.     The raid on IBM's finance employees in violation of Mr. Greiner's non-solicitation/non-hire agreement has had a severe detrimental impact on IBM.

78.     Each of the employees who has gone to work at CSC was a valued employee on whom IBM has spent considerable monetary and human resources training, and IBM was grooming each of them for promotion within the Company.  One of the employees, Greg Loeffert, participated in the Finance Management Assessment Program, a significant investment of time and money by the Company to identify and help shape future finance leaders in IBM.  Some or all were, or were soon to be tagged as, "Business & Technical Leadership" resources, another indicator of leadership potential.

79.     Though these employees have the right to seek employment at any company, including CSC, Mr. Greiner's non-solicit/non-hire agreement prohibited him from personally recruiting them, and CSC is prohibited from interfering with the agreement between IBM and Mr. Greiner by inducing him to breach his obligations.  The loss of IBM's substantial investment in the development of all this talent, and the need to incur additional expenditures and direct additional resources to replace that talent, is only part of the damage caused by Mr. Greiner's breach of contract and CSC's tortious conduct.

80.     In addition, because of the number of employees who have left all at the same time, and all in the finance area, it will be that much more difficult to replace

them quickly.  And IBM has no assurance that the damage will not be continuing, as there may be more employees that Mr. Greiner and CSC have in their sights.

81.    Under the terms of Mr. Greiner's equity award, in addition to obtaining equitable relief to prevent Mr. Greiner from violating the equity award agreement, IBM is entitled to rescind the award because of Mr. Greiner's activities in soliciting and hiring IBM employees.  Thus, in addition to other damages inflicted by Greiner, he is required to return to IBM the value of his equity award, $63,039.90.

82.    The prospectus for Mr. Greiner's equity award also provides that IBM is entitled to attorneys' fees and other costs in connection with an action to enforce the terms of the equity award plan.

## COUNT I
## BREACH OF CONTRACT
## (Against Christopher Greiner)

83.    IBM repeats and realleges the allegations of Paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.    The 1999 Plan and the associated Terms and Conditions are an enforceable contract that Mr. Greiner agreed to by participating in the 1999 Plan and accepting his equity award.

85.    IBM has fully performed its obligations to Mr. Greiner under the terms of the equity award agreement.

86.    Mr. Greiner has breached and is continuing to breach his contractual promise not to "directly or indirectly hire, solicit, or make an offer to any employee of the Company to be employed or perform services outside of the Company."

87.    IBM has already been severely injured by Mr. Greiner's improper and prohibited actions.  If Mr. Greiner is not enjoined from continuing to breach his non-

solicitation and non-hire agreement, IBM will be irreparably injured.

88.     IBM has no adequate remedy at law for Mr. Greiner's ongoing breaches of his contractual promise.

## COUNT II
## Tortious Interference with Contract
### (Against CSC)

89.     IBM repeats and realleges the allegations of Paragraphs 1 through 88 of the Complaint as if fully set forth herein.

90.     On information and belief, CSC, knowing that Mr. Greiner had a contractual obligation not to solicit or hire IBM employees to work for CSC or any other company, intentionally and without justification induced Mr. Greiner to breach his contractual obligation not to solicit or hire IBM employees to work for CSC.

91.     IBM has incurred damages resulting from CSC's tortious interference with its contractual relations with Mr. Greiner and will be irreparably injured if they are not enjoined from continuing their tortious interference.

## COUNT III
## Breach of Fiduciary Duty
### (Against Christopher Greiner)

92.     IBM repeats and realleges the allegations of Paragraphs 1 through 91 of the Complaint as if fully set forth herein.

93.     As an employee of IBM prior to November 6, 2012, Mr. Greiner owed IBM fiduciary duties of loyalty and good faith.

94.     Mr. Greiner breached his fiduciary duties to IBM by soliciting one of IBM's employees to work for CSC, an IBM competitor, while Mr. Greiner was still an employee of IBM.

95.     Had IBM discovered Mr. Greiner's wrongdoing, it would have

terminated Mr. Greiner for cause.

96.     IBM is therefore entitled to compensatory damages in an amount at least equivalent to compensation paid to Mr. Greiner after his breach.

**COUNT IV**
**Declaratory Judgment:  Rescission of Equity Award**
**(Against Christopher Greiner)**

97.     IBM repeats and realleges the allegations of Paragraphs 1 through 96 of the Complaint as if fully set forth herein.

98.     Pursuant to the terms of the 1999 Plan, IBM is entitled to rescind equity awards granted to Mr. Greiner in the twelve months prior to his joining CSC, and Mr. Greiner is obligated to return and/or repay the amount of those awards, in addition to paying compensatory damages for his breach.

99.     Mr. Greiner has engaged in "detrimental activity" under the terms of the 1999 Plan by, among other things, directly or indirectly hiring, soliciting, and making offers to IBM employees to be employed by CSC, and by going to work for CSC, a competitor of IBM.

100.     There is an actual controversy between the parties concerning IBM's right to rescind Mr. Greiner's equity award and to demand its repayment under the terms of the 1999 Plan.

101.     Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of Mr. Greiner's equity award.

**PRAYER FOR RELIEF**

WHEREFORE, IBM demands judgment in its favor and against defendants and seeks the following relief:

(A)     Awarding IBM compensatory damages in an amount to be

19

determined at trial sufficient to compensate the Company for the injury already sustained by Mr. Greiner's breach of contract and CSC's tortious interference;

(B)     A preliminary and permanent injunction enjoining and restraining Defendant Greiner, from January 15, 2013 through November 6, 2014, from directly or indirectly recruiting, soliciting, hiring, or making an offer to hire any IBM employee, and from attempting to recruit, solicit or hire any IBM employee, to be employed or perform services outside of IBM, including but not limited to contacting, meeting with, interviewing, recommending, evaluating, discussing internally at CSC or with headhunters, or discussing possible job opportunities with any IBM employees for such purposes;

(C)     A preliminary and permanent injunction enjoining and restraining Defendant CSC, from January 15, 2013 through November 6, 2014, from inducing, causing, encouraging or permitting Defendant Greiner to directly or indirectly recruit, solicit, hire or make an employment offer to hire any IBM employee to be employed or perform services outside of IBM and from using any information learned from Mr. Greiner to recruit, solicit, hire or make an employment offer to any IBM employee;

(D)     A declaration that IBM is entitled to rescind and demand repayment of the equity award granted to Mr. Greiner prior to his accepting employment with CSC and his violation of the terms and conditions of the 1999 Plan;

(E)     Awarding IBM compensatory and exemplary damages for the defendants' tortious conduct in an amount to be determined at trial;

(F)     Awarding IBM its attorneys' fees, costs, and disbursements

incurred as a result of this action; and

        (G)    Awarding IBM such further relief as the Court deems just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Dated: New York, New York
       January 14, 2013

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

      Martin Flumenbaum
      Robert A. Atkins
      Michele Hirshman
      Marc Falcone
      Robert N. Kravitz

      1285 Avenue of the Americas
      New York, New York  10019-6064
      (212) 373-3000
      mflumenbaum@paulweiss.com
      ratkins@paulweiss.com
      mhirshman@paulweiss.com
      mfalcone@paulweiss.com
      rkravitz@paulweiss.com

      *Attorneys for Plaintiff*
      *International Business Machines Corporation*